UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
VICTORIA DRAKE,

Plaintiff,

-against-

PAOLO ZAMPOLLI, individually,

Defendant.
-----------------------------------------------------------------X

Index No.: 1:26-cv-07582

**COMPLAINT**

Plaintiff Demands a Trial by Jury

Plaintiff, Victoria Drake, by and through her attorneys, Arcé Law Group, P.C., hereby complains of Defendant PAOLO ZAMPOLLI ("ZAMPOLLI"), upon information and belief, as follows:

**NATURE OF THE CASE**

1. Defendant ZAMPOLLI is a presidentially-appointed diplomat and long-time fixture within American political and social circles. From his early career in the modeling industry to his current role as a U.S. Special Envoy, Defendant ZAMPOLLI has leveraged his access to young models to cultivate and maintain relationships within high-profile networks.

2. Along those lines, Defendant ZAMPOLLI has operated in the same orbit as convicted sex offender Jeffrey Epstein. Specifically, in or around 2004, Defendant ZAMPOLLI and Mr. Epstein jointly bid to purchase Elite Model Management at a public auction. In 2013, Defendant ZAMPOLLI also partnered with Mr. Epstein's close associate, Ghislaine Maxwell, on a nonprofit venture. Recent disclosures by the United States Department of Justice ("U.S. DOJ") concerning Mr. Epstein, repeatedly referenced Defendant ZAMPOLLI, particularly that Mr. Epstein and Ms. Maxwell trafficked models associated with Defendant ZAMPOLLI's agency. These facts reflect Defendant ZAMPOLLI's sustained proximity to, and involvement with, individuals engaged in the exploitation of women.

3. *Like Mr. Epstein*, Defendant ZAMPOLLI used his influence to pressure, intimidate, punish, and often harm individuals who did not "bend at his will." For example, in June 2025, Defendant ZAMPOLLI used his status as a presidential appointee to deport Amanda Ungaro, his former domestic partner and the mother of his son, through the U.S. Department of Immigration and Customs Enforcement ("ICE"). Remarkably, those efforts were successful, as she was consequently detained in an ICE detention facility for several months before choosing to self-deport, given the facility's deplorable conditions.[1]

4. Against this backdrop, Defendant ZAMPOLLI's conduct in this case was not an aberration, but a manifestation of the entitlement and impunity with which he operated.

5. Plaintiff complains pursuant to the New York City Gender Motivated Violence Act, N.Y.C. Admin Code §§ 8-901 *et seq.*, based upon the supplemental jurisdiction of this Court pursuant to *Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking damages to redress the injuries she has suffered as a result of being sexually assaulted and raped by Defendant ZAMPOLLI.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship, and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00.

7. Venue is proper in this district based upon the fact that a substantial part of the events and omissions giving rise to the claim occurred within the Southern District of New York. 28 U.S.C. § 1391(b).

## PARTIES

8. At all times material, Plaintiff was and is a female resident of the State of Illinois, Cook County.

[1] *See* https://www.nytimes.com/2026/03/20/us/paolo-zampolli-ice-melania-trump-epstein.html.

9. At all times material, Defendant ZAMPOLLI was and is a male resident of the State of New York, New York County.

## MATERIAL FACTS

10. Defendant ZAMPOLLI is an Italian-born businessman and former modeling agent.

11. By his own account, Defendant ZAMPOLLI introduced Donald J. Trump ("President Trump") to First Lady, Melania Knauss Trump, in 1998.[2]

12. Since then, Defendant ZAMPOLLI and President Trump have maintained close ties.

13. In 2004, Defendant ZAMPOLLI served as the Trump Organization's Director of International Development.

14. In 2005, Defendant ZAMPOLLI attended Melania and President Trump's wedding.

15. Since his first term, President Trump has appointed Defendant ZAMPOLLI to numerous posts, including the John F. Kennedy Center for the Performing Arts' Board of Trustees[3] and President Trump's Council on Sports, Fitness & Nutrition.

16. Most recently, in or around March 2025, President Trump designated Defendant ZAMPOLLI a "U.S. Special Envoy for Global Partnerships."[4]

17. Meanwhile, on November 19, 2025, the Epstein Files Transparency Act (H.R. 4405/S. 2557) was signed into law. Among other things, the Act required the Attorney General to:

> "make publicly available in a searchable and downloadable format all unclassified records, documents, communications, and investigative materials in the possession of the [U.S. DOJ], including the Federal Bureau of Investigation and United States Attorneys' Offices, that relate to: (1) [Mr.] Epstein including all investigations, prosecutions, or custodial matters. (2) [Ms.] Maxwell [and] (4). Individuals, including government officials, named or referenced in connection with [Mr.] Epstein's criminal

---

[2] *See* https://www.thetimes.com/us/american-politics/article/paolo-zampolli-melania-trump-epstein-amanda-ungaro-rz5t8k87q.

[3] *See* John F. Kennedy Board of Trustees, https://www.kennedy-center.org/about-us/leadership/trustees/.

[4] *See* U.S. Embassy in Uzbekistan, https://uz.usembassy.gov/u-s-special-envoy-for-global-partnerships-paolo-zampolli-returns-to-uzbekistan-for-olympic-council-of-asia-general-assembly/.

activities, civil settlements, immunity or plea agreements, or investigatory proceedings."

18. The U.S. DOJ has since released approximately 3.5 million pages of documents related to Mr. Epstein and Ms. Maxwell (the "Epstein Files").

19. Defendant ZAMPOLLI's name appears in multiple documents throughout the Epstein Files.

20. In one document, Defendant ZAMPOLLI is described as "sleazy."[5] His name appears in a second document amongst a list of purported "killers."[6]

21. In a third document, an email dated February 15, 2011, *Mr. Epstein* wrote, "Be careful. [Defendant ZAMPOLLI] is trouble. Lots."[7]

22. Unfortunately, years later, Plaintiff learned exactly what kind of "trouble" concerned *Mr. Epstein* about Defendant ZAMPOLLI.

**PLAINTIFF, DEFENDANT ZAMPOLLI, AND MAR-A-LAGO**

23. In 2019, Plaintiff began attending gatherings at Mar-a-Lago, a private social club in Palm Beach, FL, which President Trump owns. Plaintiff originally attended Mar-a-Lago with her then-boyfriend, whose father was one of the club's members.[8] These Mar-a-Lago visits were sporadic. Still, Plaintiff cultivated meaningful connections with numerous high-profile individuals given that access.

24. Nevertheless, in or around early 2023, Plaintiff visited Mar-a-Lago less frequently when she and her boyfriend broke up. Plaintiff never spoke to or met Defendant ZAMPOLLI during this period.

25. However, Plaintiff saw Defendant ZAMPOLLI at Mar-a-Lago on multiple occasions and came to recognize him as a fixture within President Trump's social and political circle.

[5] *See* Department of Justice, Epstein Files, DataSet 9, EFTA00173834, https://www.justice.gov/epstein.
[6] *See* Department of Justice, Epstein Files, DataSet 11, EFTA02618736, https://www.justice.gov/epstein.
[7] *See* Department of Justice, Epstein Files, DataSet 10, EFTA01836539, https://www.justice.gov/epstein.
[8] Plaintiff has never been a member of Mar-a-Lago and has only visited the property as a guest.

**PLAINTIFF MEETS DEFENDANT ZAMPOLLI**

26. In or about October 5, 2023, Plaintiff was in New York City visiting friends.

27. That night, at approximately 10:30PM, Plaintiff and a friend attended Zero Bond, a nightclub located in Manhattan's "NoHo" neighborhood.

28. Shortly after Plaintiff's arrival, Defendant ZAMPOLLI, who was also at Zero Bond, approached her and introduced himself. The two then recounted recognizing each other from Mar-a-Lago and their shared admiration for President Trump.

29. However, after approximately thirty minutes, Defendant ZAMPOLLI shifted to more personal topics, and asked Plaintiff whether she was in a romantic relationship.

30. Plaintiff replied that she was single, and further explained that she had attended Mar-a-Lago less frequently after breaking up with her ex-boyfriend. Defendant ZAMPOLLI then asked Plaintiff for her phone number.

31. Based on Defendant ZAMPOLLI's question, Plaintiff reasonably believed that he had an ulterior sexual motive. However, she also knew that he was well-respected within the Republican Party and believed that networking with him might "open doors" and lead to further connections with the powerful social and political circles to which she was previously exposed while visiting Mar-a-Lago.

32. Therefore, Plaintiff gave Defendant ZAMPOLLI her phone number.

33. Later that evening, Defendant ZAMPOLLI invited Plaintiff, her friend, and two Junior United Nations Ambassadors to his townhome, located at 119 East 17th Street, New York, NY 10003, for a "nightcap."

34. When Plaintiff and her friend agreed to go, Defendant ZAMPOLLI's driver took the group to Defendant ZAMPOLLI's townhome and arrived at approximately 12:30 AM.

35. Over the next two hours, the group engaged in casual conversation, had drinks, and toured Defendant ZAMPOLLI's townhome.

36. The townhome was a sprawling, multi-floor residence, that housed multiple tenants, and contained a "Situation Room," "Ambassador Room," at least one elevator, and featured a pool and adjacent bedroom.

37. At approximately 2:30 AM, Plaintiff left Defendant ZAMPOLLI's townhome, without issue.

**DEFENDANT ZAMPOLLI ORCHESTRATES A SECOND ENCOUNTER**

38. The next morning, Defendant ZAMPOLLI texted Plaintiff, "My girl. [ ] Princess [ ] I have an early dinner. At 7:45 [PM]. Can we go to [C]asa Cipriani[?]. ***I want to get to know you***." (Emphasis added).

39. Again, Plaintiff believed that Defendant ZAMPOLLI was sexually and/or physically attracted to her. However, those feelings were not mutual. Plaintiff hoped that he would eventually "take the hint" and that a collegial friendship would eventually form.

40. Therefore, that afternoon, Plaintiff texted Defendant ZAMPOLLI, "Hi! Sorry I'm just seeing this [ ] I have a dinner with my friends at [10:00 PM] but let's grab a drink at [Casa Cipriani] at [7:45 PM]?"

41. Defendant ZAMPOLLI and Plaintiff then texted throughout the night about meeting after their respective dinners, including plans for Defendant ZAMPOLLI to meet with Plaintiff and her friend and attend to Casa Cipriani.

42. From approximately 11:30 PM to 1:43 AM, Defendant ZAMPOLLI texted Plaintiff incessantly. Some and such messages included: "No. But. I tell you what we do;" "We. Go to Trump world;" "2 [options];" "Zero;" "Or my friend place. Ph. At. Trump;" "I want to see [you];" If [you] need [time] [with] your Friends no rush;" "Just tell me;" Lmk;" "[a heart emoji];" "Zero rush;" "Just wanted to follow up;" "[a picture depicting the words 'Love you'];"

"Take all your time enjoy. Your friend. Just call when [you guys are] done;" "??;" "What's next;" "????;" "???"

43. Plaintiff did not respond.

44. Then, at approximately 1:45 AM, Defendant ZAMPOLLI called Plaintiff *again* and invited her to his townhome for a "get together" with several Massachusetts Institute of Technology and Harvard College graduates.

45. Though Plaintiff was already at her friend's apartment, Plaintiff was not tired and thought it would be a good networking opportunity, and thus, looked forward to meeting new people.

46. Therefore, Plaintiff agreed to meet Defendant ZAMPOLLI at his townhome.

47. Defendant ZAMPOLLI then called Plaintiff an Uber, and she arrived at his townhome at approximately 3:00 AM.

**DEFENDANT ZAMPOLLI RAPES PLAINTIFF**

48. Upon arriving, Plaintiff noticed only two other people in the townhome, both of whom were in their mid-twenties or early thirties.

49. Moments later, Defendant ZAMPOLLI greeted Plaintiff and offered her a drink, which she drank.

50. Plaintiff's last memory that night was sitting on the couch in the townhome's living room and observing Defendant ZAMPOLLI consume copious amounts of cocaine.

51. Plaintiff then lost consciousness.

52. Upon information and belief, Defendant ZAMPOLLI intentionally drugged Plaintiff in order to sexually assault her.

53. In her brief moments of consciousness, Plaintiff recalled laying on her back in a bed, in dimly lit lighting, **fully naked, with Defendant ZAMPOLLI laying on top of her and sweating**

**profusely onto her body, while gripping her neck with both hands, and vaginally penetrating her with his penis**.

54. Plaintiff did not, and could not, consent to any sexual contact with Defendant ZAMPOLLI.

55. **Defendant ZAMPOLLI's conduct constituted sexual assault and rape**.

56. The next morning, Plaintiff woke up still naked in the same bed where she was raped, and recognized that she was still on a lower-level floor within Defendant ZAMPOLLI's townhome.

57. Plaintiff also noticed bruising on her hips and legs. Moreover, Plaintiff could not locate her clothes.

58. Because of the "labyrinth" layout of Defendant ZAMPOLLI's townhome, **Plaintiff was forced to walk through the location completely naked until she found an elevator, which brought her to a tenant's apartment, wherein the tenant provided her with clothes and a phone charger**.

59. Though Plaintiff was still disoriented, she found an elevator and eventually ended up on a floor she did not recognize. There, she saw Defendant ZAMPOLLI's son playing video games, and realized that she was back in Defendant ZAMPOLLI's townhome. Defendant ZAMPOLLI then nervously approached Plaintiff near the elevator, and asked whether she was okay and if she had "gotten lost."

60. Still disoriented and struggling to piece together what had just happened, Plaintiff stated that she could not find her clothes.

61. Defendant ZAMPOLLI then stated, "Let's go back to the basement and have a talk."

62. Mortified, Plaintiff followed Defendant ZAMPOLLI to the basement where he returned her clothing. Little conversation ensued. Plaintiff got dressed and told Defendant ZAMPOLLI that she was leaving, to which Defendant ZAMPOLLI responded, "Text me later if you want."

63. Plaintiff left Defendant ZAMPOLLI's townhome at approximately 12:00 PM.

64. Later that afternoon, Defendant ZAMPOLLI sent Plaintiff numerous apologetic and belligerent text messages, including, “Please. Tell. Me;” “Bab. R u ok;” “Bab. Really;” “I am so sorry. We were. In such a perfect mood. Belford;” “Your hair. Are. So Stong and. Beautiful;” “Bab. Are Cv Uk.”

65. The next day, Plaintiff filed a police report with the New York City Police Department concerning the October 7, 2023, rape.

66. That same day, Plaintiff was transported by ambulance to Lenox Health Greenwich Hospital, 30 7th Ave, New York, NY 10011, where she underwent a Drug Facilitated Sexual Assault Examination (“DFSA”) and a Sexual Assault Forensic Examination (“SAFE”).

67. Plaintiff was diagnosed with ecchymosis (bruising) of the left leg, contusion of hip, an abrasion to the right wall/breast region, and was prescribed medication to stop the development of sexually transmitted diseases.

68. On or about October 9, 2023, Plaintiff returned to her home in Chicago, Illinois.

69. Defendant ZAMPOLLI’s actions and conduct were intentional and intended to harm Plaintiff.

70. Defendant ZAMPOLLI would not have sexually assaulted Plaintiff but for her sex/gender.

71. As a result of Defendant ZAMPOLLI’s actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

72. As a result of Defendant ZAMPOLLI’s actions, Plaintiff suffered and continues to suffer severe emotional distress and physical ailments.

73. As a result of the acts and conduct complained of herein, Plaintiff has suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

74. As Defendant ZAMPOLLI’s conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages.

**AS A FIRST CAUSE OF ACTION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**GENDER-MOTIVATED VIOLENCE PROTECTION ACT**

75. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

76. The Administrative Code of the City of New York § 8-903 provides that:

    a. 'Crime of violence' means an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another, whether or not those acts have actually resulted in criminal charges, prosecution, or conviction.

    b. 'Crime of violence motivated by gender' means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender."

77. The Administrative Code of the City of New York § 8-904 provides that, "Any person claiming to be injured by an individual who commits a crime of violence motivated by gender as defined in section 8-903 of this chapter, shall have a cause of action against such individual in any court of competent jurisdiction."

78. Defendant ZAMPOLLI engaged in conduct that violated the Gender Motivated Violence Protection Act sections as set forth herein.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant ZAMPOLLI:

A. Declaring that Defendant ZAMPOLLI engaged in unlawful gender motivated violence prohibited by the New York City Administrative Code;

B. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation in an amount in excess of the jurisdiction of all lower courts;

C. Awarding Plaintiff Punitive Damages;

D. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

E. Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendant ZAMPOLLI's unlawful actions.

**JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE,** Plaintiff demands judgment against Defendant ZAMPOLLI in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of this action; and for such other relief as the Court deems just and proper.

Dated: September 3, 2026
New York, NY

**Arcé Law Group, P.C.**
*Attorneys for Plaintiff*

By: *_/s/ Jesse S. Weinstein_*
Jesse S. Weinstein, Esq.
Max C. Bracero, Esq.
45 Broadway, Suite 2810
New York, NY 10006